## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>         **Plaintiff,**<br><br>     vs.<br><br>**DANIEL RAY CALDWELL,**<br>         **Defendant.** | **CASE NO: 4:21-MJ-107-KPJ** |

## ORDER OF DETENTION PENDING TRIAL

### Part I – Eligibility for Detention

Upon the

☒ Motion of the Government pursuant to 18 U.S.C. § 3142(f)(1), or

☐ Motion of the Government or Court's own motion pursuant to 18 U.S.C. § 3142(f)(2),

the Court held a detention hearing and found that detention is warranted. This Order sets forth the Court's finding of fact and conclusions of law, as required by 18 U.S.C. § 3142(i), in addition to any other findings made at the hearing.

### Part II – Findings of Fact and Law as to Presumptions under § 3142(e)

☐ **A. Rebuttable Presumption Arises Under 18 U.S.C. § 3142(e)(2)** (*previous violator*): There is a rebuttable presumption that no condition or combination of conditions will reasonably assure the safety of any other person and the community because the following conditions have been met:

☐ **(1)** the defendant is charged with one of the following crimes described in 18 U.S.C. § 3142(f)(1):

   ☐ **(a)** a crime of violence, a violation of 18 U.S.C. § 1591, or an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed; or

   ☐ **(b)** an offense for which the maximum sentence is life imprisonment or death; or

   ☐ **(c)** an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the Controlled Substances Act (21 U.S.C. §§ 801-904), the Controlled Substances Import and Export Act (21 U.S.C. §§ 951-971), or Chapter 705 of Title 46, U.S.C. (46 U.S.C. §§ 70501-70508); or

   ☐ **(d)** any felony if such person has been convicted of two or more offenses described in subparagraphs (a) through (c) of this paragraph, or two or more State or local offenses that would have been offenses described in subparagraphs (a) through (c) of this paragraph if a circumstance giving rise to Federal jurisdiction had existed, or a combination of such offenses; or

1

☐ **(e)** any felony that is not otherwise a crime of violence but involves: (i) a minor victim; (ii) the possession of a firearm or destructive device (as defined in 18 U.S.C. § 921); (iii) any other dangerous weapon; or (iv) a failure to register under 18 U.S.C. § 2250; **and**

☐ **(2)** the defendant has previously been convicted of a Federal offense that is described in 18 U.S.C. § 3142(f)(1), or of a State or local offense that would have been such an offense if a circumstance giving rise to Federal jurisdiction had existed; and

☐ **(3)** the offense described in paragraph (2) above for which the defendant has been convicted was committed while the defendant was on release pending trial for a Federal, State, or local offense; **and**

☐ **(4)** a period of not more than five years has elapsed since the date of conviction, or the release of the defendant from imprisonment, for the offense described in paragraph (2) above, whichever is later.

☒ **B. Rebuttable Presumption Arises Under 18 U.S.C. § 3142(e)(3)** (*narcotics, firearm, other offenses*): There is a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant and the safety of the community because there is probable cause to believe that the defendant committed one or more of the following offenses:

☐ **(1)** an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the Controlled Substances Act (21 U.S.C. §§ 801-904), the Controlled Substances Import and Export Act (21 U.S.C. §§ 951-971), or Chapter 705 of Title 46, U.S.C. (46 U.S.C. §§ 70501-70508);

☐ **(2)** an offense under 18 U.S.C. §§ 924(c), 956(a), or 2332b;

☒ **(3)** an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed;

☐ **(4)** an offense under Chapter 77 of Title 18, U.S.C. (18 U.S.C. §§ 1581-1597) for which a maximum term of imprisonment of 20 years or more is prescribed; **or**:

☐ **(5)** an offense involving a minor victim under 18 U.S.C. §§ 1201, 1591, 2241, 2242, 2244(a)(1), 2245, 2251, 2251A, 2252(a)(1), 2252(a)(2), 2252(a)(3), 2252A(a)(1), 2252A(a)(2), 2252A(a)(3), 2252A(a)(4), 2260, 2421, 2422, 2423, or 2425.

☒ **C. Conclusions Regarding Applicability of Any Presumption Established Above**

☒ The defendant has not introduced sufficient evidence to rebut the presumption above, and detention is ordered on that basis.

OR

☐ The defendant has presented evidence sufficient to rebut the presumption, but after considering the presumption and the other factors discussed below, detention is warranted.

### Part III – Analysis and Statement of the Reasons for Detention

After considering the factors set forth in 18 U.S.C. § 3142(g) and the information presented at the detention hearing, the Court concludes that the defendant must be detained pending trial because the Government has proven by:

☒ clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community.

☐ a preponderance of the evidence that no condition or combination of conditions of release will reasonably assure the defendant's appearance as required.

On February 9, 2021, the Government filed a Criminal Complaint, which alleged Defendant violated the following federal statutes:

- 18 U.S.C. § 231(a)(3) (Obstruction of Law Enforcement During Civil Disorder);
- 18 U.S.C. § 111(a)(1) (Assaulting, Resisting, or Impeding Certain Officers or Employees);
- 18 U.S.C. § 1752(a)(1), (2), (4) (Knowingly Entering or Remaining in Any Restricted Building or Grounds Without Lawful Authority); and
- 40 U.S.C. § 5104(e)(2)(D), (F) (Violent Entry and Disorderly Conduct on Capital Grounds.

On March 3, 2021, a Federal Grand Jury returned an Indictment, which charged Defendant with the following violations:

- Count 1: 18 U.S.C. § 231(a)(3) (Civil Disorder);
- Count 2: 18 U.S.C. §§ 111(a)(1), (b) (Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon);
- Count 3: 18 U.S.C. §§ 1752(a)(1), (b)(1)(A) (Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon);
- Count 4: 18 U.S.C. §§ 1752(a)(2), (b)(1)(A) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon) and
- Count 5: 18 U.S.C. §§ 1752(a)(4), (b)(1)(A) (Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon).

The United States moved to detain Defendant pending trial.

The Court held a detention hearing on February 22, 2021, which continued March 4, 2021. Assistant United States Attorneys Tracey M. Batson and William Richardson Tatum represented the Government, and John Hunter Smith represented Defendant. The Court heard testimony from three witnesses: Special Agent Seth D. Webb ("Agent Webb"), Ms. Kambria Caldwell ("Ms. Caldwell"), and Mr. James Caldwell ("Mr. Caldwell").

**AGENT WEBB**

Agent Webb of the Federal Bureau of Investigation ("FBI") testified regarding the details of the alleged offenses and investigation leading to Defendant's arrest. Agent Webb stated that on January 6, 2021, around 1:00 p.m. Eastern Time, the United States Congress met in Washington, D.C, at the Capitol to certify the electoral college vote for the 2020 presidential election. The Capitol was closed to the public that day, with temporary barricades in place and the doors secured. However, a large group of individuals pushed back the barricades, stormed the Capitol, and delayed the election's certification.

On January 27, 2020, Twitter user @chris_sigurdson posted links to two videos. The first link directed to a YouTube video titled "Storm The Capitol w/ dream floral." The second linked directed to a video created by ProPublica, an investigative journalism news outlet.

The YouTube video depicts a large group storming the Capitol. Approximately three minutes and fifteen seconds in, a male wearing dark-tinted eyewear is depicted. The male then sprays an orange mist towards a police barricade line, and the person filming the video can be heard coughing and gasping for breath.

The ProPublica video depicts a male speaking with two females, with the male onscreen and the females offscreen. In the video, the male is wearing a camouflage hat, camouflage trousers, an olive-colored hoodie, a camouflage backpack, and a sticker above his left breast stating, "Guns SAVE lives." The male also has darkly tinted eyewear on his hat. Agent Webb testified the male's eyewear was specialized gear, rather than ordinary sunglasses. According to Agent Webb, the eyewear was designed to create a sealed, protective barrier, thereby preventing debris, projectiles, and mist from harming the eye.

In the ProPublica video, the male states that after ten minutes of storming the Capitol, a large fight ensued, resulting in a female being injured in the neck and transported to receive medical care. The male further states the Capitol police officers sprayed the group with mist repellant, which prompted the male say, "Dude, do it again, and I'll spray you back." The male then admits to spraying approximately fifteen police officers in response. Notably, in the YouTube video, Capitol police officers cannot be seen spraying rioters with any mist repellant.

In the ProPublica video, the male further claims the Capitol police officers shot him with "a cannon rubber bullets." Overall, the male's tone of voice was nonchalant. The two offscreen women thanked the male for his actions and stated they "were very proud of him," to which the male briefly smiled. At one point, the male reached down to his leg, revealing a black-and-white patch with what Agent Webb describes as a "unique logo."

A confidential informant claimed Defendant was depicted in both videos and provided Defendant's phone number. Using Defendant's phone number, Agent Webb then obtained Defendant's geolocation data, which revealed Defendant traveled from Texas to Washington, D.C., in the days leading up to the Capitol riots. Agent Webb testified the data showed Defendant was in the D.C. metropolitan area on January 6, 2021, and the data specifically pinpointed Defendant was at the Capitol at the time of the riots.

In his examination of the ProPublica video, Agent Webb noticed a stylized "R," which he later identified as the logo of The Renaissance Hotel in Arlington, Virginia. Agent Webb then obtained the hotel's business records, which showed Defendant was a guest at the hotel the day before the Capitol riots.

Agent Webb also testified that three sources confirmed Defendant was depicted in the ProPublica video. First, a witness ("Witness 1") stated he knew Defendant personally, as Witness 1 and Defendant frequently participated in Airsoft Military Simulation ("MilSim") events together. MilSim is a live-action, in-person simulation of armed conflict scenarios involving plastic projectiles. When Agent Webb showed Witness 1 a picture of Defendant's driver's license, with Defendant's name obscured, and the ProPublica video, Witness 1 confirmed both the driver's license and the ProPublica video depicted Defendant. Second, Defendant's ex-wife confirmed Defendant was depicted in the ProPublica video. Third, Agent Webb used facial recognition technology to determine whether a picture of Defendant's face matched with any video on the Internet. The software independently found a match between the sample picture of Defendant and the ProPublica video.

Witness 1 also told Agent Webb that Defendant was "a huge white supremacist" and "a complete whacko." According to Witness 1, when Witness 1 brought an African American teenager to MilSim events, Defendant would ask Witness 1 "why he always brings these f****** n******." On cross-examination, Agent Webb admitted he did not corroborate Witness 1's allegations.

Additionally, Witness 1 informed Agent Webb that, on multiple occasions, Defendant would bring real firearms to MilSim events. According to Witness 1, the organization admonished Defendant multiple times, directing Defendant to return the firearms to his vehicle.

Through his investigation, Agent Webb learned Defendant worked at Texas Instruments ("TI") at that time (Defendant was terminated from TI as a result of the conduct on which the underlying charges are based).

4

Agent Webb obtained Defendant's work schedule, and on February 10, 2021, the FBI arrested Defendant at TI. In a search incident to an arrest, agents seized the olive-green hoodie depicted in the ProPublica video. Agents also seized the black-and-white patch and the camouflage outerwear, though the FBI did not locate any mist repellant during this incident. At the time of the arrest, Ms. Kambria Caldwell ("Ms. Caldwell"), defendant's ex-wife and current co-habitant, was present. Agent Webb testified an agent asked Ms. Caldwell about Defendant's criminal history, and Ms. Caldwell stated he had none. An agent informed Ms. Caldwell that a search warrant would be executed at Defendant's residence, and the agent asked Ms. Caldwell whether there was anything dangerous of which agents should be aware. Ms. Caldwell answered in the affirmative, stating Defendant's residence contained thirteen (13) firearms locked in a safe.

### MS. CALDWELL

Defendant called Ms. Caldwell to testify as a potential third-party custodian. Ms. Caldwell stated she has known Defendant for twenty-seven years. They were married for fourteen years, separated, reconciled, and became co-habitants in 2015. Together, Ms. Caldwell and Defendant have three children: a daughter who is twenty-five years of age, a daughter who is nineteen years of age, and a son who is fifteen years of age.

Ms. Caldwell testified Defendant's pretrial detention had been difficult for their son, as Defendant and the son are "very close," and they often attend MilSim events together. She further testified that Defendant possibly suffers from a post-traumatic brain injury. Because of Defendant's arrest, he missed an appointment for an assessment with Veterans Affairs. Ms. Caldwell stated she understood the responsibilities and duties of serving as a third-party custodian, and she was willing to enforce them should Defendant be released on conditions.

On cross-examination, the Government asked Ms. Caldwell about the pretrial services report. According to the report, Defendant has been estranged from his mother and two brothers. When asked about the details of the estrangement, Ms. Caldwell was vague, stating they have been estranged "for several years" and she did not know the cause of the estrangement. When asked to give an estimated number of years, Ms. Caldwell could not provide an answer.

Ms. Caldwell further testified she was shocked when she heard Agent Webb state Defendant was a white supremacist, as Defendant has Hispanic and African American friends from his days at TI. The Government then asked whether African American friends had ever come over to Defendant and Ms. Caldwell's residence. Ms. Caldwell responded, "No." The Government asked Ms. Caldwell to name one African American friend of Defendant. After a lengthy pause, Ms. Caldwell named "Shauntessa." After another pause, Ms. Caldwell stated Shauntessa's surname was "Russell." The Government then asked for the name of another African American friend, to which Ms. Caldwell stated "Larry Tidwell" and "Sammy Edwards." Ms. Caldwell testified she and Defendant have known Larry Tidwell for twenty-four years, as Larry Tidwell worked with Defendant at TI. She then testified Defendant was one of Sammy Edwards' closest friends, as they often went to airsoft events together.

The Government then queried Ms. Caldwell whether she has ever heard Defendant make any racially charged comments. Ms. Caldwell, after another long pause, stated "No." The Government reminded Ms. Caldwell she was under oath, and re-asked the question. Ms. Caldwell answered "No."

Ms. Caldwell denied ever telling an FBI agent Defendant lacked a criminal history, thereby contradicting Agent Webb's testimony. Ms. Caldwell testified, "I would have been truthful" if asked about Defendant's criminal history, and she did not recall the FBI ever asking that question. Ms. Caldwell testified she knew Defendant had a few DUI's, and she had an altercation with Defendant resulting in police intervention. When asked about the altercation, Ms. Caldwell testified, "Well, we had been going through a lot of things—issues— so it was all coming to a point where we were both very heated. So, it just escalated, and it was—so, I had to

5

call 911 and there was a 911 interference and so by the time they came, they were going to arrest both of us. But they arrested [Defendant] for 911 interference." The Government then read the police report's contents, which explicated that, on February 25, 2008, Defendant became very violent, slammed Ms. Caldwell on a table, straddled her, picked her up, sat her back down, and picked her up again. The police report states Ms. Caldwell attempted to call 911, but Defendant "yanked" the phone out of the wall. Ms. Caldwell's oldest daughter then had to call 911 on her cell phone. Ms. Caldwell admitted that after this incident, she sought a restraining order against Defendant and initiated divorce proceedings.

Ms. Caldwell then testified to knowing Defendant planned on being in Washington, D.C., on January 6, 2021, though she did not know he intended to storm the Capitol. She stated she wanted to go with Defendant, but due to back surgery, Ms. Caldwell was unable to travel. Ms. Caldwell also testified Defendant asked his father to travel to the Capitol, but Defendant's father ultimately did not go. Ms. Caldwell stated that, when Defendant returned home, he told Ms. Caldwell things got out of hand and he got hit by a rubber bullet. However, before that happened, Defendant stated he met some really nice people, and walked with one from the hotel to the Capitol.

Ms. Caldwell testified that she and Defendant own nineteen (19) firearms, two (2) of which belong to Ms. Caldwell. She stated the firearms are no longer at her residence, and they are now with Ms. Caldwell's oldest daughter.

### MR. CALDWELL

Defendant also called Mr. Caldwell, Defendant's father, to testify as a potential third-party custodian. Mr. Caldwell testified that he is sixty-eight years of age and lives in Eustace, Texas, with his wife and daughter. Mr. Caldwell's current wife is not Defendant's biological mother. According to the pretrial services report, the whereabouts of Defendant's biological mother are currently unknown. Mr. Caldwell testified he speaks to his son on the phone almost daily.

Mr. Caldwell further testified he was aware of the allegations against his son, and stated his residence contains no firearms, ammunition, explosives, or alcohol. Mr. Caldwell stated his retirement status would allow him to monitor his son, should Mr. Caldwell serve as a third-party custodian.

Mr. Caldwell testified he was not aware of an arrest occurring in Dennison, Texas. The Government explained that on October 24, 2013, Defendant was arrested for driving while intoxicated. Because Defendant physically resisted the police officers, the officers added a count for resisting arrest. At the hospital, Defendant was so physically aggressive that the hospital staff had to restrain him to draw blood. After being restrained, Defendant was able to break the hospital bed. When Defendant was later in jail, he was so physically aggressive that the jail officers tased him. Mr. Caldwell testified he did not know about this incident, and he did not know the extent of his son's actions. Mr. Caldwell stated he felt Defendant would respect him and follow his instructions.

When asked about Defendant's estrangement from his biological mother and brothers, Mr. Caldwell testified he did not know how to explain it. Mr. Caldwell stated Defendant owes his brothers several thousands of dollars. As to Defendant's biological mother, Mr. Caldwell testified, "You can't get the truth from her." Mr. Caldwell stated she "does medication" and "there's trouble there."

**CONCLUSION**

While the Court acknowledges Ms. Caldwell earnestly wishes for Defendant to be released and carry out his role as a father to their children, the Court does not find Ms. Caldwell to be a suitable third-party custodian. Throughout her testimony, Ms. Caldwell readily and quickly answered questions from Defendant's counsel, but slowly and vaguely answered questions from the Government and the Court. Ms. Caldwell's hesitancy and selective manner of answering casts doubt on the credibility of her testimony. Combined with the February 25, 2008 incident, the Court is not confident that Ms. Caldwell will be able to enforce the conditions of release were Defendant placed under her custody. Because of her testimony, the Court is not confident Ms. Caldwell will promptly and truthfully contact the Court if Defendant violated a condition of release.

With respect to Mr. Caldwell, the Court also appreciates his willingness to assist the Court and help his son. Nevertheless, the Court does not find Mr. Caldwell to be a suitable third-party custodian. Mr. Caldwell testified that he was unaware of previous incidents of violence engaged in by Defendant and, specifically, was unaware of the alleged acts of violence charged against Defendant in the Indictment. Accordingly, the Court is neither confident that Mr. Caldwell will be able to enforce the conditions of release, nor is it confident that Mr. Caldwell will promptly and truthfully contact the Court if Defendant violated a condition of release.

Because the Court cannot currently fashion any condition or combination of conditions that will reasonably assure the safety of any other person and the community as required in these proceedings, the United States' Motion for detention is **GRANTED**, and Defendant is detained pending his sentencing hearing.

In addition to any findings above or other findings made on the record at the hearing, the reasons for detention include the following:

- ☒ Weight of evidence against the defendant is strong
- ☒ Subject to lengthy period of incarceration if convicted
- ☒ Prior criminal history
- ☐ Participation in criminal activity while on probation, parole, or supervision
- ☒ History of violence or use of weapons
- ☒ History of alcohol or substance abuse
- ☒ Lack of stable employment
- ☐ Lack of stable residence
- ☐ Lack of financially responsible sureties
- ☒ Lack of significant community or family ties to the charging district
- ☐ Significant family or other ties outside the United States
- ☐ Lack of legal status in the United States

☐ Subject to removal or deportation after serving any period of incarceration

☐ Prior failure to appear in court as ordered

☐ Prior attempt(s) to evade law enforcement

☐ Use of alias(es) or false documents

☐ Background information unknown or unverified

☐ Prior violations of probation, parole, or supervised release

## Part III - Directions Regarding Detention

The defendant is remanded to the custody of the Attorney General or to the Attorney General's designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. The defendant must be afforded a reasonable opportunity for private consultation with defense counsel. On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility must deliver the defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

**So ORDERED and SIGNED this 5th day of March, 2021.**

_____
KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE